September 11, 2015

Abel Acosta, Clerk
Court of Criminal Appeals
P.O. Box 12308
Capitol Station
Austion, Texas

Valentin Moreno, Jr.
788216, Robertson Unit
12071 FM 3522
Abilene, Texas 79601

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 18 2015

Re: Your Letter Dated (09-01-15) & Refiling
    Last known Writ No. WR-49,474-04

Greetings Mr. Acosta:

On June 15, 2015, I filed an application for writ of habeas corpus, in the 332nd District Court of Hidalgo County, Texas. The cause number therein, was CR-0517-96-F(3). On July 20, 2015, Judge Mario E. Ramirez, Jr., entered his Findings of Facts, Conclusions of Law, Recommendation and Order. I then filed in this Court; Applicant's Objections and Applicant's Request for Judicial Notice. However, these pleadings were all sent back by you, with a letter advising me, that my application had not been received by your office. Your letter further advised me to contact the Hidalgo County District Clerk, with any questions I may have.

It is my understanding, that at this time, the mentioned application was sent and received by your office and filed on September 2, 2015. It appears that, the mentioned application was received by your office, a day after you sent me the mentioned letter.

Enclosed you will find the following pleadings: Applicat's Motion for Remand for an Evidentiary Hearing, Applicant's Request for Judicial Notice and the Applicant's Objections to the State's Response. all to be filed with the current application for writ of habeas corpus, and brought to the attention of the Court, as time permits.

In the enclosed, self-addressed stamped envelope, please return to me a stamped filed copy of this cover-letter.

Thank you for your attention and assistance.

Respectfully,

Valentin Moreno Jr.

cc:file

49,474-05

IN THE COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

| | | |
|---|---|---|
| EX PARTE | § | Writ No._____ |
| | § | |
| VALENTIN MORENO, JR. | § | Trial Court Cause No.CR-0517-96-F |
| | § | Out Of The 332ND District Court |
| APPLICANT | § | Hidalgo County, |
| | § | State of Texas |

## APPLICANT'S OBJECTIONS TO STATE'S RESPONSE TO APPLICATION FOR WRIT OF HABEAS CORPUS SEEKING RELIEF FROM FINAL CONVICTION

TO THE HONORABLE JUSTICES OF SAID COURT:

Comes Now, Valentin Moreno, Jr., Applicant, pro se in the above mentioned cause, and respectfully files Applicant's Objections To state's Response To Application For writ Of Habeas Corpus Seeking Relief From Final Conviction. In support thereof, the Applicant would show the following:

I.

(1.) On June 15, 2015, applicant filed a successive application for writ of habeas corpus, (herein after AA-3). Said application challended a jury's finding of guilty, for the offense of capital murder.

(2.) On July 8, 2015, the State filed the State's Reponse to Application for writ of habeas corpus, (herein after [SR]).

(3.) Applicant did not receive a copy of the [SR], till July 21, 2015. Yet, the [SR] alleges that, applicant was sent a copy on July 8, 2015.

II.

Applicant submitted AA-3, under the provisions of Code of Criminal Procedure Articles 11.07, 11.073 and the provisions set for by Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851 (1995). In AA-3, Applicant asserted that, he is actually innocent and that his conviction is the result of constitutional violations, invoking the **Schlup** standard. And, invoking art. 11.073, with scientific evidence that, contradicts the scientific evidence relied on by the State

Page 1.

at trial. However, the State has chosen to ignore the provisions set forth by art. 11.073, **Schlup** and the "new" evidence Applicant has submitted.

### III.
### Article 11.073

Applicant contends that, the [SR] fails to acknowledgeand respond to Applicant's Gound Number One (A), submitted uder Code of Crim. Prod., art. 11.073 (a)(2). [H]owever, Applicant vigorously contends that, the [SR] incidentally concedes that Applicant meets the provisions of 11.073 (a)(2).

At Applicant's trial, through the scientific testimony of psychologist Dr. A.J. Alamia (herein after Dr. Alamia), the State led the jury to believe that "in traumatic events the human memory functions like a camera; 'taking snapshots that stay ingrained in the memory'." Then, in Closing Arguments the State "[e]mphasized" on Dr. Alamia's scientific testimony (e.g., his "camera" and "human memory" analogy), to **bolster** and **substabtiate** the testimonies of the State's key witnesses.

In AA-3, Applicant presented credible and reliable scientific evidence that "contradicts" and shows that Dr. Alamia's scientific testimony was "false". According to University of Texas Pan American psychology professor Dr. James Aldridge, 'the human memory does "[n]ot" work photographically'. Pursuant to his assessment of Dr. Alamia's scientific testimony, Dr. Aldridge determined that the testimony was **misleading** and **false.** [See Exhibit A, Dr. Aldridge's Affidavit, attached hereto.]

In support of Dr. Aldridge's affidavit, in AA-3, Applicant submitted the research and conclusions of other psychologist. More importantly, Applicant submitted data put together by the Innocence Project. That data shows that, 75 percent of DNA exonerations, the principle cause for the erroneous guilty verdict, was [m]istaken eyewitness identification. And, in most of those

Page 2.

cases, if not all, involved a traumatic event. These DNA exonerations show us, that the human memory does not work like a camera, substantiating Dr. Aldridge's affidavit.

The [SR] states, "Applicant supports the claim that the witness provided "false" testimony by way of an opinionprovided by another expert. As such, this is more properly a battle of experts rather than "false" testimony. [See Exhibit B, [SR], Pg.5, Footnote 2, attached hereto.]

**Article 11.073, states , in pertinet part:**
(a) This article applies to relevant scientific evidence that:
(2) **contradicts scientific evidence relied on by the State at trial.**

Applicant contends that, Dr. Aldridge's affidavit and/or the data from the Innocence Project, clearly contradicts the scientific testimony of Dr. Alamia, "which the State relied on at trial." See Ex Parte Robbins, 2014 Tex. Crim. App. LEXIS 1900 (TCCA 2014).

By ignoring the Innocence Project data, the [SR] only acknowledes Dr. Adlridge's affidavit, by referring to the affidavit and Dr. Alamia's trial testimony; **"a battle of experts"**. Applicant argues, that battle of experts translates into, "contradicting experts". By the states own admission (e.g., "battling experts"), Applicant contends that the State had incidentally that Applicant has met the provisions set forth by Article 11.073 (a)(2). [See Exhibit B, Pg.5, footnote 2, attachered hereto.]

Pursuant to the foregoing, Applicant respectfully asks this Court, to abate the recommendation and order to dismiss AA-3, and send the case back to the district court, for a full evidentiary hearing on Applicant's article 11.073 argument and evidence.

For the foregoing reasons, Applicant respectfully "objects" to the State's Response.

## IV.
### ACTUAL INNOCENCE CLAIM vs. PROCEDRUALLY BARRED CLAIM

Applicant submitted AA-3, asserting that he is actually innocent and that his conviction is the result of constitutional violations, (e.g., prosecutorial misconduct and ineffective assistance of counsel). The [SR] argues, that AA-3 is procedrually barred by the prohibition against subsequent writs and that the Court should not consider the merits of or grant relief based on the subsequent application.

First, Applicant contends that the state has chosen to ignore the provisions set forth by Code of Crim. Procd. art. 11.073 and Ex Parte Robbins, 2014 Tex. Crim. App. LEXIS 1900 (TCCA 2014). As there is no mention or response to these law in the [SR]. Article 11.073, now provides a new legal bases for habeas relief in a small number of cases, this includes subsequent habeas corpus applications. Applicant presented arguments under this article.

Second, the heart of AA-3, contends that Applicant is innocent and was filed under the provisions set forth in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851 (1995). A credible claim of actual innocence serves to bring applicant within the 'narrow class of cases' that implicate a "fundamental miscarriage of justice". In other words, showing actual innocenceby a preponderance of the evidence is a gateway through which a habeas applicant must pass in order to have his otherwise-barred constitutional claims considered on the merits. "[B]ut", applicant is not required to prove his innocence before the court can consider the merits of the aubsequent application, but is only required to make a **"prima facie"** showing of innocence.

to determine whether applican's allegations of constitutional violations are excluded by the procedrual bar against successive applications, it must first be determined whether applicant has made a thresholding showing "that

a constitutional violation led to a miscarriage of justice due to the incarceration of someone who is actually innocent.

The primary conviction was obtained through the trial testimonies of Raul Guerrero, Yvonne Gonzales, Beatrice Trevino and Dr. A.J. Alamia (herein after, Mr. Guerrero, Ms. Gonzales, Ms. Trevino and Dr. Alamia).

For the following reasons, Applicant "objects" to the [SR], and contends he has made a 'prima facie' showing of innocence:

(a)

In AA-3, Ground Number One (A), Applicant argued and presented credible scientific evidence (Dr. Alamia's Affidavit and the Innocence Project research), that shows the State presented the "false" scientific testimony of Dr. Alamia. Through Dr. Alamia's testimony, the "jury was led to believe that in traumatic events the human memory functions like a camerea; 'taking snapshots'." The State then [e]mphasized of Dr. Alamia's scientific testimony, in their Closing Arguments, to "[b]olster" the testimonies of the State's 'key' witnesses.

At the time of applicant's trial, there had only been a hand-full of DNA exonerations. With little, to no research, on the origin of the erroneous verdict. Since Applicant's trial, there has been over 2000 DNA exonerations. With studies on the origin of the erroneous guilty verdicts. In 75 percent of those cases, the principle cause for the erroneous guilty verdicts, was mistaken eyewitness identification. In most of those cases, if not all, there was a traumatic event involved.

Applicant contends that, the last fifteen years of research on eyewitness identifications and the data from the Innocence Project, substantiate Dr. Aldridge's affidavit. Specifically, that "the human memory does "[n]ot function like a camera, and that Dr. Alamia's scientific testimony was misleading and false. [See Exhibit A, attached hereto.]

The State knowingly or unkowingly presented Dr. Alamia's false testimony, either way, Applicant was denied due process by such, and that is at the heart of Applicat's claim that, a constitutional violation resulted in the conviction of one who is innocent. Applicant respectfully requests the Court to send the case back to the district court, for a full evidentiary hearing on these issues.

(b)

Inn AA-3, Ground Number One (B), Applicant argued and presented credible scientific evidence (e.g., Dr. Aldridge's affidavit and scientific data on Post-Event Information) that shows, the State influenced and/or contaminated State witness Beatrice Trevino's identification of the applicant.

Applicant argued that, after Ms. Trevino confessed to the prosecutor (Mrs. Sofia Arizpe) that, she believed she has mis-identified the applicant, the prosecutor exposed Ms. Trevino to unduly suggestive post-event information (herein after, PEI), which resulted in a contaminated in-court-identification.

Pursuant to this argument, Applicant would point out and ask the Court to take **Judicial Notice,** of what the State alleges. The State alleges that, "they did expose Ms. Trevino to the PEI Applicant complains about, [b]ut, that the State only shared the PEI with Ms. Trevino "[a]fter applicant's trial. [See Exhibit B, Pg. 5, Footnot 3, attached hereto.]

In direct contradiction of what the State alleges, Applicant has presented evidence that shows, the State shared the suggestive PEI with Ms. Trevino **"[b]efore"** his trial. Influencing Ms. Trevino's in-court-identification of the applicant. According to Ms. Trevino's trial testimony at applicant's trial, the incident where the prosecutor exposed her to what Applicant calls PEI, "it occurred **'before'** she testified under oath." [See Exhibit C, Pg. 13, Ln. 11-20; Pg.19, Ln. 23-25; Pg.20, ln.1-15.] Applicant contends the trial record substantiates his version, and shows Hidalgo County Assistant District Attorney Michel W. Morris has violated State Bar Rule 3.03(a)(1) and (5).

Pursuant to the trial record showing that, the State exposed Ms. Trevino to the suggestive PEI applicant complains about, "before" his trial. The Applicant would ask the Court to take Judicial Notice that, the State has incidentally "admitted" to influencing Ms. Trevino's in-court-identification.

The State influencing and/or contaminating Ms. Trevino's in-court-id of the Applicant, with suggestive PEI, denied Applicant right to due process. And that, is at the heart of Applicat's Schlup claim. Based on the foregoing, Applicant asks the Court to send the case back to the district court, for a full evidentiary hearing on these issues. Applicant would point out, that his Brady and presenting a mistaken identification claims, cannot be decided till the "after" and "before" issue is resolved.

(c)

In AA-3, Ground Number One (C), Applicant argued and presented credible

Page 6.

scientific evidence, and the recantation of the State's star witness . Yvonne Gonzales, which shows that, the State mislead the jury with Ms. Gonzales' false testimony.

Applicant argued that, the scientific findings of ballistics expert Max Scott and forensic optometry specialist Dr. Paul Michel shows that, Ms. Gonzales' trial testimony was unreliable, misleading and false. According to Mr. Scott the ballistic-related evidence showed that, the shooting could not have occurred as testified by Ms. Gonzales. How the shooting happened was at the essence of Ms. Gonzales' trial testimony. According to Dr. Michel, "Ms. Gonzales would not have been able to identify the suspect (applicant) under the conditions she encountered during the crime, such an identification is blatantly invalid." [See Exhibit D, Dr. Michel's Affidavit, attached hereto.]

Furthermore, Applicant presented an affidavit from Ms. Gonzales, where she states that, she belives she mis-identified the applicant, believes he is innocent and will help prove his innocence. [See Exhibit E, Yvonne Gonzales' Affidavit, attached hereto.] Said affidavit also reveals that, Ms. Gonzales was exposed to PEI.

The experts findings alone show that, Ms. Gonzales' trial testimony and in-count-identification of the applicant, were unreliable, invalid and wrong. Applicant would bear emphasis, on Ms. Gonzales' affidavit, and the fact that it substantiates the experts findings, and the experts findings substantiate Ms. Gonzales' affidavit.

It is argued that, the new evidence (e.g., experts affidavits & Ms. Gonzales' affidavit), show that, the State mislead the jury with Ms. Gonzales' incorrect testimony. The false testimony denying Applicant right to due process. And that, is at the heart of Applicant's Schlup claim.

Based on the foregong, Applicant asks the Court to send his case back to the district Court, for a full hearing on these issues and Applicant's Brady claim.

## V.
### PRIMA FACIE SHOWING

The foregoing, raises sufficient doubt about Applicant's guilt to undermine confidence in the result of the trial and conviction. This conviction was obtained on the scientific testimony of Dr. Alamia, and the in-court-identifications of Ms. Gonzales and Ms. Trevino. The trial testimonies of those ctitical witnesses

has now been shown to have been unreliable, misleading and false. So, 75 percent of the evidence relied on by the State at trial, was severely wrong. All that false evidence the jury heard and considered, fall upon the State and supports Applicant Schlup claim.

Applicant contends he has made a "prima facie" showing of actual innocence, which is required in order to demonstrate that the constitutional violations at his trial did, in fact, result in a miscarriage of justice.

Based on the foregoing, Applicant Schlup claim and the 'prima facie' showing requirement. Applicant respectfully requests a full hearing, to develop the record, meet and support his prima facie requirement.

## VI.
## APPLICANT'S OBJECTIONS TO STATE'S RESPONSE

Applicant reasserts his arguments and objections to the [SR], in regards to AA-3 Ground Number One (A),(B).and (C), argued in this pleading. [See Pages 2 thru 7, herein.] Applicant argues that those claimes of prosecutorial misconduct and the following claims of ineffective assistance of counsel, are properly before this Court, pursuant to Applicant's Schlup claim.

In AA-3, Ground Number Two (A), Applicant argued and contends that, trial counsel was ineffective for: failing to investigate.and have a firm grasp of Dr. Alamia's propsed scientific testimony. Counsels actions and inactions, introduced into the trial an expert that was prejudicial to the defense.

Through Dr. Alamia, the State was able to mislead the jury to believe that, in traumatic events the human memory functions like a camera. The State then used, Dr. Alamia's erroneous scientific testimony to "bolster" the testimonies of the State's "key" witnesses. Clearly, the Applicant was severely harmed by trial counsels ineffective assistance.

In AA-3, Ground Number Two (B), Applicant argued and contends, that, trial counsel was ineffective for: failing to investigate Ms. Gonzales' improbable indentification of applicant's "eyes"; failing to consult and present ballistics

Page 8.

In AA-3 Ground Number Two (C), Applicant argued that trial counsel was ineffective for: failing to investigate and present a prior incident involving Det Buenrostro and the applicant. Specifically, an incident Where Det. buenrostro allegedly threatened two juveniles into signing false statements against the applicant.

This was critical to Applicant's case, because the witnesses in the primary case only identified the applicant "after" being reinterviewed by Det. Buenrostro. Counsel had a duty to bring this ctritical information before applicant's jury.

In AA-3, Ground Number Two (D), Applicant argued that was ineffective for: failing to protect his interests and rights; to due process and a fair trial. Trial counsel failed to protect applicant from State witness Beatrice Trevino's unduly influenced and/or contaminated in-court-identification. Counsel in no way protected applicant from the State's miscoduct.

Applicant contends that, the foregoing arguments are presented on there own, together and in support of his Schlup claim. Pursuant to the scientific related evidence submitted in support of these arguments, Applicant would ask the Court, to send this case back to the district court for a full evidentiary hearing on these issues. Clearing the scientific evidence that Applicant presented in AA-3, creates issues in controversy.

## VII.
### JUDICIAL NOTICE

Applicant respectfully ask this Court to take "Judicial Notice" of the following: (1) The State failed to respond to Applicant's Art.11.073 claims, (2) The State conceded that Applicant's expert contradict the scientific evid. the state relied on at trial. (3) The State has admitted that they infuenced Ms. Trevino's identification with PEI. (4) The State violated State Bar Rule 3.03 (a) (1) & (5).

Page 9.

## CONCLUSION

Applicant contends that he has made a prima facie showing of actual innocence, and for that reason "objects" to the [SR] to his Ground Number One, Two, Three and Four. The new scientific evidence Applicant submitted in support of his successive application, put all his arguments in controversy and need to be resolved, before a final ruling can be decided. For those reasons, Applicant requests a hearing. Based on the foregoing, Applicant reasserts his claim of innocence, and claim that this conviction is the result of the constitutional violations he alleges.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Applicant respectfully prays this Honorable Court accpts these objections, takes Judicial Notice, and sends the case back to the district court, for a full evidentiary hearing. and, grants any relief the Court may deem proper.

Done on this _31st_ day of _July_ , 2015.

Respectfully Submitted,

Valentin Moreno, Jr., Pro Se
788216, Roberson Unit
12071 FM. 3522
Abilene, Texas 79601

Page 10.

## VERIFICATION

I, Valentin Moreno, Jr., do hereby certify under the penalty of perjury that, the contents in Applicant's Objections to the State's to Application for Writ of Habeas Corpus Seeking Relief from Final Conviction, is true and correct.

Done on this _3/6/_ day of ___July___, 2015

_(signature)_
Valentin Moreno, Jr.

## CERTIFICATE OF SERVICE

I, Valentin Moreno, Jr., hereby certify, that the original copy of the foregoing pleading, was sent to Abel Acosta, Clerk for the Court of Criminal Appeals and Laura Hinojosa, Hidalgo Counrt District Clerk, with a request said motion be filed in the 332 District Court, and brought to the attention of Judge Mario E. Ramirez and the attorney representing the State.

Done on this _3/1/_ day of ___July___, 2015.

_(signature)_
Valentin Moreno, Jr.

Page 11.

NO _____

_____           _____
_____           _____
_____           _____
_____           _____
_____           _____
_____

## AFFIDAVIT

THE STATE OF TEXAS
COUNTY OF HIDALGO

BEFORE ME, the undersigned authority, on this day personally appeared

JAMES ALDRIDGE, who

swore or affirmed to tell truth, and stated as follows:

"My name is JAMES ALDRIDGE

I am of sound mind and capable of making this sworn statement. I have personal knowledge of the facts written in this statement. I understand that if I lie in this statement I may be held criminally responsible. This statement is true.

1. I received a Ph.D. in Experimental Psychology with a subspecialty in human learning and memory from the State University of New York at Binghamton in 1976. I have been a professor in the Psychology Department at the University of Texas Pan American and its predecessors since 1977, where I have taught advanced courses in memory for my entire time there. I have also produced numerous articles and presentations on memory and the perception of situations in professional journals and at professional conferences.

2. I am speaking for myself and not for the university.

3. I have never met Valentin Moreno and am offering the following information without a fee, as a public service. All information is verifiably well within my area of expertise.

page 1 of 3 — James Aldridge Affidavit

4. Mr. Moreno has asked me to comment on an assertion made in his trial and provided me with pages 90 through 110 of Volume XVII of the transcript. The witness appears to assert that in individual emotional situations memory always becomes highly accurate or photographic. I declare with a a reasonable degree of scientific certainty that such an assertion was misleading and not true, and was not an accepted characteristic indicated by memory research at the time of Mr. Moreno's trial. In fact, intense emotionality may diminish the accuracy of memory. The assertion made by the witness to Mr. Moreno's jury was therefore incorrect.

5. It was suspected at one time that memories for large-scale earthshaking events, such as the bombing of Pearl Harbor or President Kennedy's assassination, are unusually accurate. However, even in these situations it turns out that the circumstances may make memories quite vivid even if they are inaccurate. Vividness being mistaken for accuracy may cause a person to be quite confident of a false memory.

6. In two thirds of convictions overturned on the basis of DNA evidence, the convictions were at least in part based on eyewitness testimony. Although Mr. Moreno's case does not involve DNA evidence, the frequency of inaccurate eyewitness testimony revealed by these cases is an important indicator that memories of eyewitnesses are not as reliable as once thought.

7. Mr. Moreno also asked me to comment on whether post-event information may lead to distortion of memory for the event. The answer is definitely yes, and this occurs to a much larger degree than common sense would lead one to expect. This was established as early as 1974, when a researcher named Elizabeth Loftus studied the effect of questions asked after viewing an automobile accident. If a question included the word "smashed", witnesses were almost twice as likely to later falsely remember broken glass than if the same question used the word "hit". Worse, the false detail apparently became a permanent part of the witness's memory of the accident. This result spawned a large amount of research which confirmed and expanded the finding that even seemingly trivial information after an event could cause large distortions in memory of the event.

8. I was working at the University of Texas Pan American in Edinburg at the time or Mr. Moreno's trial, as was another memory expert who could have also testified to points 4 - 7 above. I, at least, was never contacted. If I had been I would have testified to them as I am doing now, pro bono.

State of Texas
County of Hidalgo

SWORN to and SUBSCRIBED before me, the undersigned authority, on the _26_ day of _November_ , _2014_ year, by

_James Aldridge_
[PRINT the first and last names of the person who is signing this affidavit.]

RAMONA A. MANCHA
MY COMMISSION EXPIRES
June 1, 2017

Notary Public, State of Texas [Notary's signature.]

[Notary's seal must be included.]

EXHIBIT B

Cause No. CR-0517-96-F(3)

Ex parte                              §

                                      §

Valentin Moreno, Jr.,                 §      332nd Judicial District

                                      §

Applicant                             §      Hidalgo County, Texas

---

## STATE'S RESPONSE TO APPLICATION
## FOR A WRIT OF HABEAS CORPUS SEEKING RELIEF FROM FINAL
## FELONY CONVICTION UNDER CODE OF CRIMINAL PROCEDURE,
## ARTICLE 11.07

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas, by and through the Criminal District Attorney of Hidalgo County, and files this Response to Application for a Writ of Habeas Corpus Seeking Relief from Final Felony Conviction under Code of Criminal Procedure, Article 11.07, and would show that, pursuant to Section 4 of Article 11.07 of the Texas Code of Criminal Procedure, no hearing is necessary in this matter; and that, in fact, the application for a writ of habeas corpus should be DISMISSED.

### STATEMENT OF FACTS

The records of the case below reflect the following:

1.     On March 3, 1996, Applicant was convicted by a jury of the offense of capital murder and was sentenced to life Imprisonment in the institutional Division of the Texas Department of Criminal Justice.

8.  On June 15, 2015, Applicant filed his third application (hereinafter cited as AA) for a writ of habeas corpus under article 11.07 of the Texas Code of Criminal Procedure alleging: (1) prosecutorial misconduct; (2) due ineffective assistance of counsel; (3) cumulative error; and (4) actual innocence.

9.  The State was served with Applicant's Application on June 23, 2015, and its response is therefore due no later than July 8, 2015. *See* TEX. CODE CRIM. PROC. art. 11.07 § 3(b) (2015).

10. This Court must determine whether or not there are controverted, previously unresolved facts, material to the legality of Applicant's confinement no later than July 26, 2015. *See id.* § 3(c).

## ARGUMENT

In his first application for a writ of habeas corpus, Applicant raised issues which challenged the merits of the underlying conviction. On April 24, 2002 Applicant's first application was properly denied. (WR-49,474-02). On May 10, 2011, Applicant filed a second application for writ of habeas corpus, which was dismissed as subsequent under section 4 of Article 11.07 of the Texas Code of Criminal Procedure. (WR-49,474-04). Applicant filed a second subsequent writ asserting alleging: (1) prosecutorial misconduct; (2) due ineffective assistance of

Applicant asserts that he is actually innocent and that his conviction is a result of constitutional violations. AA at 6, 8, 12. Specifically Applicant alleges that: the prosecution engaged in misconduct by eliciting "false testimony" from defense expert Dr. A.J. Alamia[2]; the prosecution influenced State witness Beatrice Trevino's identification with unduly suggestive post-event information[3]; the State presented false testimony through Yvonne Gonzales; and the State withheld ballistic evidence. AA at 6-7. Additionally, Applicant alleges that trial counsel was ineffective for: failing to investigate Dr. Alamia's proposed Scientific testimony; investigate Yvonne Gonzales' identification; failed to investigate ballistic evidence; failed to investigate prior incidents with Det. Buenostro; and Counsel failed to protect Applicant's interests and constitutional rights with regards to Beatrice Trevino's revelation regarding her identification. Applicant alleges that he meets the exception to the prohibition against subsequent writ applications set forth in Section 4(a)(2) of the Code of Criminal Procedure.

To establish that he has met the "fundamental miscarriage of justice" exception in Section 4(a)(2), an applicant is required to make a prima facie showing of actual innocence in order to demonstrate that the constitutional

---

[2] Applicant supports the claim that this witness provided "false" testimony by way of an opinion provided by another expert. As such, this is more properly a battle of experts rather than "false" testimony.

[3] This claim has been litigated on direct appeal adversely to applicant. Further, the only "new" aspect of this claim is that the witness was influenced by some post event information. However, the post event information applicant complains of was only provided to the witness *after* she testified in his trial. The State contends this could not have influenced her testimony.

testimony[4]. See Applicant's Exhibits A-7 and A-13[5]. This does not establish that applicant is actually innocent rather; it establishes that if the expert is to be believed, the eye witness' testimony might be flawed. Without definitive evidence that Applicant did not participate or could not have participated, these experts do not establish any claim of actual innocence. As for Yvonne Gonzales' affidavit, it merely states that she cannot be sure her identification of Applicant was properly. *See* Applicant's Exhibit A-16. Given the intervening years and the fact that she does not state that Applicant was not a participant, this affidavit does not provide affirmative evidence which shows or tends to show that Applicant is actually innocent. Rather, it merely states that Ms. Gonzales is no longer as sure as she was at trial of her identification of Applicant. Applicant must make some showing of actual innocence; not just raising some doubt as to his guilt. *See Ex parte Franklin*, 72 S.W.3d 671, 677 (Tex. Crim. App. 2002).

As such, Applicant's claim is procedurally barred by the prohibition against subsequent writs and the court should not consider the merits of or grant relief based upon the subsequent application.

WHEREFORE, PREMISES CONSIDERED, the State prays:

---

[4] Each expert also states that they were available to testify at the time of the trial; as such, the evidence is not newly discovered as it would have been available at the time of Applicant's first writ. See Applicant's exhibits A-7 and A-13.
[5] Further, the State would point out that Mr. Scott's "opinion" on what a witness could see is outside of his expertise as a ballistics expert.

testimony[4]. See Applicant's Exhibits A-7 and A-13[5]. This does not establish that applicant is actually innocent rather; it establishes that if the expert is to be believed, the eye witness' testimony might be flawed. Without definitive evidence that Applicant did not participate or could not have participated, these experts do not establish any claim of actual innocence. As for Yvonne Gonzales' affidavit, it merely states that she cannot be sure her identification of Applicant was properly. *See* Applicant's Exhibit A-16. Given the intervening years and the fact that she does not state that Applicant was not a participant, this affidavit does not provide affirmative evidence which shows or tends to show that Applicant is actually innocent. Rather, it merely states that Ms. Gonzales is no longer as sure as she was at trial of her identification of Applicant. Applicant must make some showing of actual innocence; not just raising some doubt as to his guilt. *See Ex parte Franklin*, 72 S.W.3d 671, 677 (Tex. Crim. App. 2002).

As such, Applicant's claim is procedurally barred by the prohibition against subsequent writs and the court should not consider the merits of or grant relief based upon the subsequent application.

WHEREFORE, PREMISES CONSIDERED, the State prays:

---

[4] Each expert also states that they were available to testify at the time of the trial; as such, the evidence is not newly discovered as it would have been available at the time of Applicant's first writ. See Applicant's exhibits A-7 and A-13.

[5] Further, the State would point out that Mr. Scott's "opinion" on what a witness could see is outside of his expertise as a ballistics expert.

EXHIBIT C

BEATRICE TREVINO,

the witness, having been previously examined, cautioned and sworn upon her oath to tell the truth, the whole truth and nothing but the truth, then testified as follows, to-wit:

DIRECT EXAMINATION

BY MR. GOULD:

Q. Please state your name.

A. Beatrice Trevino.

Q. Okay. And you are the same Beatrice Trevino that testified previously in this case?

A. Yes, sir.

Q. Okay. Now, after your testimony on Tuesday afternoon, you approached us right after that; is that correct?

A. Yes, sir.

Q. Okay. And that's myself and Mr. McInnis?

A. Yes, sir.

Q. Okay. Now, you also recall having testified about Catalino and Valentin and there being some question about there being two people named Cat?

A. Yes, sir.

Q. Okay. What is it that you wanted to explain about that?

A. On the day I went to give my statement, I recall before I gave my statement that I had mentioned Cat but I had

said Catalino first and that name is -- like, I know Cat as Valentin, so kind of -- I think I kind of got them confused as Cat because I know Valentin more than I do Catalino.

Q.   Okay.   And whenever you were -- who did you talk to? Do you remember?

A.   The DA.

Q.   Over at -- whenever you went to the sheriff's office.

A.   I talked to -- the time I stated that, it was three in there.   It was the head of the detectives and the other two that were -- Solis and -- I can't remember back.   I can't remember.

Q.   Okay.   Did you view any photographs while you were there at the sheriff's office?

A.   Yes, I did.

Q.   Okay.   And could you explain to the jury how it w that they showed you these photographs.

A.   They first brought in one photograph of Valen and then they brought in another at a separ

Q.   Okay.   And what did they do when they bro separate photographs?

A.   What did they do?

Q.   Did they ask you anything or --

A.   If I recognized Valentin.   And I recognize him."   The other one

Q.   All right.  Now, this matter of your saying you get confused --

A.   Yes.

Q.   -- did you try and ever tell any representative of the District Attorney's office about this?

A.   Yes, I did.

Q.   Who did you try to tell?

A.   I tried to tell the District Attorney.

Q.   Are you talking about Ms. Arizpe?

A.   Yes.

Q.   Okay.  And when did you first tell her about this?

A.   Tuesday.

Q.   Tuesday?

A.   Yes.

Q.   Okay.  And that was before your testimony; is that correct?

A.   Yes.

Q.   And was there any response in reference to that?

A.   Yes.

Q.   And what was that response?

A.   Something like I was changing the story, that I had already given a statement.  And I tried to explain this had happened before I gave my statement.

Q.   Okay.  And, so, what was the -- what was the bottom line that you were told?

MAGGIE HINOJOSA, C.S.R.

12

A. That I was trying to change my statement but I'm not trying to change my statement. I'm just trying to state something that had happened before I stated my statement.

Q. Okay. All right. Now, did you ever have an occasion to speak with Ms. Arizpe before Tuesday?

A. Yes.

Q. Okay. And when was that, if you remember?

A. I don't recall the date. She called -- she had called me twice on the phone and once she went to my house.

Q. Okay. And when she went to your house, did you explain to her any reservations about your identification of any people there?

A. Yes.

Q. Okay. What did you tell her then?

A. At the time she went to my house I told her what I could recall on my statement. And she had -- she said something about, "Well, it has to be correct," or something like that, "because somebody else states the same." And I was like, well, I can't be a hundred percent sure so I cannot say that I was a hundred percent sure.

MR. GOULD: I'll pass the witness.

THE COURT: Ms. Arizpe.

CROSS EXAMINATION

Q.    Mrs. Trevino --

A.    Yes, ma'am.

Q.    -- you gave a statement to the police department; is that correct?

A.    Yes, ma'am.

Q.    And you've testified before; is that correct?

A.    Yes, ma'am.

Q.    And the last time you were called in not by the State but by the Defense; is that correct?

A.    Yes, ma'am.

Q.    And in your testimony did you not say pursuant to the questions of the attorney when you were asked, "Would you please -- one at a time, who was the first guy that got into the vehicle"?

A.    Yes.

Q.    "Juanito was the driver."

        "Okay.  And guy number two?"

        "Valentin Moreno, Joe Garcia."

        "And the third?"

        "The fourth I saw but I did not recognize."

        Do you remember saying that?

A.    Yes, ma'am.

Q.    You never mentioned anything about a Catarino; is that correct?

MAGGIE HINOJOSA, C.S.R.

14

A.   No, ma'am.

Q.   Okay.

A.   But --

Q.   Now, you were asked again, "You've indicated -- okay. Was Juanito carrying any weapon, if you saw?"

"No."

"Okay.  Was Valentin carrying a weapon, if you know?"

"Yes."

"What weapon was he carrying?"

*Assault Rifle*   "A cuerno de chivo."

"And was Joe -- was what has already been identified as Joe Garcia carrying any weapon?"

"Yes."

"And what was that?"

"A handgun."

"And that fourth person that you have not been able to identify but you have told us it's not Jessie Trevino, was he carrying a weapon?"

"Yes."

"And what kind of weapon was that?"

"I'm not sure what kind of rifle but it was a rifle."

Do you remember that testimony?

A.   Yes, ma'am.

Q. Do you remember your testimony also when I asked you about our conversations at your house --

A. Yes, ma'am.

Q. -- that you said that you did not recall because you had not read your statement?

A. Yes.

Q. Do you also recall in your statement that you gave to the sheriff's office when you said, "I then saw Juanito, Valentin Moreno, also known as Cat, and Joe Garcia start to jump into Juanito's red Pontiac Sunbird"?

A. Yes.

Q. Do you remember saying that?

Do you remember signing your statement on December 21st of 1995?

A. Yes, ma'am.

Q. Do you remember giving this statement to Joseph Buenrostro?

A. Yes.

Q. And when we discussed this again, isn't it true that I told you, well, you've already testified under oath --

A. Yes.

Q. -- about one thing? You gave a statement under oath about the same thing.

A. But as I tried to explain, this was before I gave my

statement and there was three people there that heard what I had stated.

Q. Okay. But when you signed this statement, did anybody force you to sign it?

A. No.

Q. When you came into this courtroom, did you ever tell the jury that you were not sure about Valentin Moreno?

A. I told them that I wasn't a hundred percent sure.

Q. That's correct. You said not one hundred percent sure.

A. Right.

Q. But you never said anything about not being sure about Valentin at all being there --

A. Uh-huh.

Q. -- isn't that correct?

A. That's correct.

Q. And you never once in that trial mentioned a Catarino, did you, not once?

A. No, I did not. But I did mention it --

Q. But not in the trial?

A. No.

Q. That's all I want to know.

A. Not in the trial.

Q. In the trial you never mentioned him.

Now, this Catarino that you're talking about, do you know his last name?

A. Herrera.

Q. Okay. Where does he live?

A. Edinburg.

Q. Okay. And, so, this -- when you came to my office, I told you, well, it's not in your statement and you never testified under oath --

A. Right.

Q. -- and you were placed under oath.

A. Right. But as --

Q. Now, let me --

A. Try --

Q. Now, let me ask you this, please: Are you telling me now and this jury that you lied in your statement?

A. I did not lie in my statement but there is some stuff that I remember now that did not pertain to the other case.

Q. Okay.

A. And I do wish to say that at this time.

Q. Okay. Okay. This is all I'm asking you: Did you lie in this statement when you said Valentin Moreno, also known as Cat, jumped into Juanito's red Pontiac? Did you lie here?

A. No.

Q. Did you lie under oath when you were asked about Valentin Moreno and you said he was carrying a weapon,

a cuerno de chivo? Did you lie under oath here?

A. Not under oath. Not intentionally.

Q. Okay. Well, I mean, it's one or the other, right?

A. Well, it's really not if I confused the nicknames with the names.

Q. But you know the two individuals, don't you?

A. I know Valentin more than I do Catalino.

Q. Okay. And isn't it true that you indicated in your testimony when you testified under oath --

A. Right.

Q. -- Joe Garcia, Juanito Trevino, and Valentin Moreno -- when you testified under oath, the only person you said was not in the car was Jesus Trevino?

A. Right. That is correct.

Q. And you never told us about Catarino at all?

A. No.

MS. ARIZPE: I pass the witness, Judge.

REDIRECT EXAMINATION

BY MR. GOULD:

Q. But you did tell the sheriff's office about Catalino early on before you gave your statement?

A. Yes.

Q. Okay. And you attempted to explain your confusion to Ms. Arizpe before you testified under oath in court the last time, didn't you?

A. Yes.

Q. And Ms. Arizpe tried to say, well, somebody else has identified so and so, so you've got to go ahead and stick with your statement?

MS. ARIZPE: Objection, Your Honor. Counsel is speculating as to what that statement may have been, Your Honor. He was not present.

THE COURT: Sustained. Rephrase the question.

BY MR. GOULD:

Q. Okay. What was it that was said?

A. To the point where I got it -- I got it as she's stating that two people couldn't be wrong, one being at the scene where they were in and one being at the scene where the shooting was at. And that's when I disagreed and I said I couldn't be a hundred percent sure what had happened over there because I wasn't over there.

Q. Okay. And all of these statements that you were asked about in the last time you testified, all of those statements were made after you had expressed your reservations to Ms. Arizpe when she came to your house?

A. Yes.

MR. GOULD: I pass the witness.

THE COURT: Ms. Arizpe.

RECROSS EXAMINATION

BY MS. ARIZPE:

Q.    At the last trial, Ms. Trevino, you remember we addressed that situation at your house where you had said that you were not sure?

A.    Yes, ma'am.

Q.    Let me read this to you and see if you recall my question to you in court.

"And you told me that you were distracted and turned away and that you didn't know who got into the car?"

Your answer, "I also told you I didn't recall my statement."

"Okay.  But at what point in time -- but in that point in time you told me that you were distracted"?

A.    Yes.

Q.    "I didn't recall my statement," is your answer.

"On your statement you said that?"

"I told you that I didn't recall what I wrote -- I had told them in my statement."

Question, "And remember that I asked you if you said in your statement that Juanito, Valentin, and Joe got into the car.  Would that be correct?"

And do you remember telling me, "I can't say that because I was distracted and looked away"?

A.    Yes.

Q. Now, remember that conversation?

A. Yes, ma'am.

Q. And this is your answer: "I can't say that I can pinpoint them a hundred percent. That's what I told you."

"Okay. Because it's a hundred percent that you couldn't pinpoint them, a hundred percent?"

And you proceeded to say you were a hundred percent that Jessie wasn't there.

Now, in that statement remember that you said you were distracted and you weren't sure who got into the car?

A. Yes.

Q. When we came into court, what you said in court, "No, that's not what I meant. I didn't remember what was in my statement," remember that?

A. Yes.

Q. And when you came to court to testify, the first thing that the defense attorney did was to allow you to take your statement to read it.

A. Yes.

Q. And then you testified and said what you said in your statement was correct. Do you recall that?

A. What I said in my statement was, if I recall, some of the stuff wasn't in there and some of the stuff that I

said was --

Q.   Okay.  Well --

A.   -- revised.

Q.   -- let me go to specifics then.  Let me go to specifics.

A.   Okay.

Q.   You said that what was correct in your statement was the three guys.  You were not a hundred percent sure but there were three guys.

A.   The fourth one, I didn't recall.

Q.   The fourth guy you later indicated you were distracted at some point, may have not seen him, but you knew it was not Jesus Trevino?

A.   Yes.

Q.   And that's correct, isn't it?

A.   Yes, ma'am.

Q.   Okay.  And the last time you never mentioned Catarino to the defense attorney.  You never mentioned it to the court, to the jury --

A.   Right.

Q.   -- or to me; is that correct?

A.   That is correct.  But to each case you remember a little bit more that pertains to that particular case, and this is the case where I remember that part.

Q.   Let me ask you this:  Are you saying Catarino Herrera

was in that car and had the cuerno de chivo? Is that what you're saying?

A. I'm not stating that, ma'am.

Q. Okay.

A. I'm stating that I confused the two names, two of the nickname.

Q. Okay. Now, is Valentin Moreno, Jr., known as Cat to you?

A. Yes.

Q. And you've known Valentin Moreno since what year?

A. '92.

Q. And the reason you know Valentin Moreno since '92 is because you were a security guard at P.S.J.A. South?

A. Yes, ma'am.

Q. And that's where you met Valentin Moreno?

A. Yes, ma'am.

Q. And you had seen him hanging around at times with your nephews?

A. Yes, ma'am.

MS. ARIZPE: I pass the witness.

MR. GOULD: No questions, Your Honor.

THE COURT: All right. Step down. You are subject to recall.

Your next witness.

MR. McINNIS: Judge, we would call Sabrina

Affidavit of Paul Michel, OD
Fellow, American Academy of Optometry

Reference: Texas v. Valentin Moreno, Jr.

I, Paul Michel, being dully sworn and under penalty of perjury, declare as follows:

1. My name is Paul Michel. I am 59 years of age and am competent to make this affidavit. I hold the degree: Doctor of Optometry. I hold separate bachelor degrees in psychology and in human visual science.
2. I have served as a sworn uniformed reserve police officer in Huntington Beach, California.
3. I have served as a specialist reserve investigator for the Los Angeles Police Department, Robbery/ Homicide's Officer Involved Shootings Investigations Unit.
4. I have been retained in a minimum of 42 legal matters. I have testified in state and federal courts a combined total of 15 times.
5. I have reviewed the trial testimony of Yvonne Gonzalez, police lineup photographs and reviewed medical literature which relates to this case.
6. Any human being (Ms. Yvonne Gonzales included) would not be able to be identify the suspect under the conditions encountered during the crime as she described it at trial. My conclusions are based on the following elements:
7. Positive facial identification, to the exclusion of all other persons, requires having seen the face of the person being identified. Ms. Gonzales testified the suspect's face was materially concealed with only the eye/orbit region visible. The witness made facial recognition of a face she admits was not seen.
8. I considered that on rare occasions, due to unique traits/deformities, identification can be established when such traits/deformities are so uncommon as to be unique to the individual. No such unique traits/deformities exist with the facial appearance of Valentin Moreno, Jr now or during 1995.
9. Specifically, Valentin Moreno, Jr. eyes, eyelids and eyebrows do not possess unique identifiable characteristics from others of his age, gender and ethnic background. Slightly down slanted brown eyes with olive skin color and brown eyelashes & eyebrows are so common as to be considered approaching the norm among the demographics of San Juan, Texas. Moreno's eyes/orbits are unremarkable in appearance and do not have characteristics that would distinguish his eyes/ orbits from many in this community.
10. Excessive tearing decreases human visual acuity (the ability to see detail). The degree to which excessive tearing exists determines the magnitude of vision loss. Since the degree of tearing cannot be determined, the magnitude of the extent of the visual disability posed is largely unknown; however, it can only have a negative effect on a witness's vision.
11. Tearing of the eyes is a minor impediment to making valid identification when compared to never actually having seen the suspect's face. The claim that facial identification could be made via momentary viewing of nondescript orbital areas is blatantly invalid. Witness Gonzales stated:" I'm a hundred

percent about his eyes, about him being there because of the lighting." Mere copious lighting does not enable a witness to make positive identification while the overwhelming majority of the suspect's face was concealed from the witness' view.

12. The six pack photo lineup does not contain the required 5 fillers in addition to 1 of the suspect. Subject number 1 has his eyes completely closed, his eyelids are down. Moreover, the eyebrows are grimaced downward at the bridge of the nose and flare upward toward the temples. Subject number 1 possesses no comparison value, as his eyes are not visible and his orbital features are contorted in a facial grimace. Suspects number 4 and number 6 have their eyes partially closed with varying degrees of squinting of the eyelid and orbital muscles. Of the six photos, only Valentin Moreno's photo, number 5, and suspect photos 2 and 3 provide a wide opened view of the eyes for identification purposes, this was a 3 pack photo lineup and not a 6 pack line up.

13. My opinions expressed above are the same as they would have been in February, 1997. I would have been able to offer these opinions in 1997 if requested. My opinions are based upon being a doctor of optometry and having approximately 30 years of clinic experience. I have studied, examined and treated eyes and orbits for more than half of my life. Moreover, I have applied my knowledge of optometry to situations encountered at evolving crime scenes and police officer involved shootings.


I declare under penalty of perjury that the foregoing 13 paragraphs are true and correct.

Dated and Signed in Jefferson County, Colorado

_____
Paul Michel, OD

The foregoing instrument was acknowledged before me this 5th day of July 2014 by Paul B Michel
County of Jefferson, State of Colorado

Notary

ALEXANDRA L LONG
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20134066823
MY COMMISSION EXPIRES OCTOBER 24, 2017

July 31, 2015

Abel Acosta, Clerk
Court of Criminal Appeals
P.O. Box 12308
Capitol Station
Austin, Texas 78711

Valentin Moreno, Jr.
788216, Robertson Unit
12071 FM. 3522
Abilene, Texas 79601

Re: Ex Parte valentin Moreno, Jr.,
    Previous Writ No. WR-49,474-04
    Current writ No. _____

Greetings Mr. Acosta:

On June 15, 2015, I filed a successive application for writ of habeas corpus, in the 332nd District Court. The Hidalgo County D.A. filed the State's Response on July 8, 2015. I received a copy os the State's Reponse on July 21, 2015. At this time it is my understanding that, Judge Mario E. Ramirez of the 332nd District Court, adopted the State's propsed Findings of Fact, Conclusions of Law, Recommendation and Order.

Enclosed you will find, Applicant's Objections to the State's Response and Judge Ramirez's Findings of Fact, Conclusions of law, Recommendation and Order. Additionally, you will find enclosed, Applicant's Request for Judicial Notice. All to be filed with the current application, submitted under Code of Criminal Procedure, article 11.073.

Also enclosed is a self-addressed envelope, with postage pre-paid. Can you please return to me a stampted filed copy of this cover-letter, for my personal records.

Thank you for your time and assistance in this matter.

Respectfully,

Valentin Moreno Jr.

cc:file

RECEIVED IN
COURT OF CRIMINAL APPEALS
AUG 7 2015
Abel Acosta, Clerk